**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| ROBERT JENIS, Derivatively on Behalf of Nominal Defendant ASP ISOTOPES INC., <br><br> Plaintiff, <br><br> v. <br><br> PAUL MANN, ROBERT RYAN, MICHAEL GORLEY, DUNCAN MOORE, and TODD WIDER, <br><br> Defendants, <br><br> and <br><br> ASP ISOTOPES INC., <br><br> Nominal Defendant. | Case No.:   3:26-CV-251 <br><br><br> <u>**JURY TRIAL DEMANDED**</u> |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

Plaintiff Robert Jenis ("Plaintiff"), by and through Plaintiff's undersigned counsel and derivatively on behalf of Nominal Defendant ASP Isotopes Inc. ("ASPI" or the "Company"), brings this Verified Shareholder Derivative Complaint against Paul Mann ("Mann"), Robert Ryan ("Ryan"), Michael Gorley ("Gorley"), Duncan Moore ("Moore"), and Todd Wider ("Wider") (collectively, the "Individual Defendants" and, together with ASPI, "Defendants") for and among other things, their breaches of fiduciary duties and violations of the federal securities laws as directors and/or officers of ASPI from September 26, 2024 through November 26, 2024 (the "Relevant Period").

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information,

including filings by ASPI with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, filings in the securities class action captioned *Leone v. ASP Isotopes Inc., et al.*, Case No. 1:24-cv-09253 (S.D.N.Y) (the "Securities Class Action"), and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought against certain current and former ASPI officers and members of the Company's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants during the Relevant Period.

2.     During the Relevant Period, the Individual Defendants authorized and permitted the Company to pursue and publicly promote uranium enrichment initiatives, such as high-assay low-enriched uranium ("HALEU"), without first ensuring that the Company sufficiently tested the technologies on uranium at a laboratory or pilot scale.

3.     Despite the absence of sufficient uranium testing, the Individual Defendants caused or allowed the Company to proceed as if such testing had occurred and approved corporate actions and public representations that assumed the ASPI possessed a demonstrated capability to enrich uranium at scale.

4.     As a direct and proximate result of the Individual Defendants' failure to ensure adequate testing and oversight, ASPI has exposed itself to foreseeable and substantial harm, including (1) the waste and misallocation of corporate assets devoted to uranium enrichment initiatives premised on untested assumptions, (2) the costs and liabilities associated with defending

2

the Company in the Securities Class Action, and (3) damage to its credibility with regulators and commercial partners.

5.      Plaintiff brings this action derivatively in the right and for the benefit of the Company to recover damages sustained by the Company, to obtain disgorgement of unjustly obtained compensation, and to secure appropriate governance and compliance reforms to ensure that critical technologies are properly tested and validated before being promoted, deployed, or used to support corporate strategy.

## JURISDICTION AND VENUE

6.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims asserted herein raise a federal question under Sections 14(a) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 74u-4(f), and SEC Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9).

7.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

8.      This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

9.      This Court has personal jurisdiction over each Defendant named herein because ASPI is headquartered in this District, each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because a substantial portion of the transactions and wrongs

complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District. Moreover, the Individual Defendants caused the Company to prepare, approve, and disseminate proxy statements, SEC filings, and other governance-level disclosures from or into this District, and certain defendants conducted business, exercised oversight responsibilities, or participated in board-level and officer-level decision-making affecting the Company while located in or acting through this District.

**PARTIES**

**Plaintiff and Nominal Defendant ASP Isotopes, Inc.**

11.    **Plaintiff** is a current shareholder of ASPI and has continuously held ASPI common stock at all relevant times.

12.    **Nominal Defendant ASP Isotopes, Inc.** is a Delaware corporation whose common stock trades on the Nasdaq exchange under the ticker symbol "ASPI." ASPI is named solely as a nominal defendant because Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries sustained by the Company as a result of the misconduct alleged herein. At all relevant times, the Company was subject to the reporting, proxy solicitation, and corporate governance requirements of the federal securities laws, and its officers and directors caused the Company to prepare, approve, and disseminate proxy statements, periodic reports, and other corporate disclosures that form the basis of the claims asserted in this action.

**The Individual Defendants**

13.    **Defendant Paul E. Mann** co-founded ASPI in September 2021 and has served as Chief Executive Officer ("CEO") and Chairman of the Board since incorporation. According to a proxy statement filed on Schedule 14A with the SEC on November 11, 2025 (the "2025 Proxy"),

Defendant Mann received $4,767,309 in total compensation in 2024 and beneficially owned 8,084,191 shares of ASPI stock worth approximately $81,569,487 at the time.[1]  Defendant Mann is also named as a defendant in the Securities Class Action.

14.    **Defendant Robert Ryan** is a non-employee director who has served as chair of the Nominating and Corporate Governance Committee, as well as the Audit Committee, since January 2024. According to the 2025 Proxy, Defendant Ryan received $70,000 in Fees Paid in Cash and $304,032 in Stock Awards in 2024, and beneficially owned 615,674 shares of ASPI stock worth approximately $6,212,150 at the time.

15.    **Defendant Michael Gorley** is a non-employee director and member of the Nominating and Corporate Governance Committee who has served since October 2023. According to the 2025 Proxy, Defendant Gorley received $70,000 in Fees Paid in Cash and $304,032 in Stock Awards in 2024, and beneficially owned 81,360 shares of ASPI stock worth approximately $820,922 at the time.

16.    **Defendant Duncan Moore** has served as a non-employee director since October 2021 and is a member of the Audit and Compensation Committees as well as the Nominating and Corporate Governance Committee and the Special Project Committee.  According to the 2025 Proxy, Defendant Moore received $70,000 in Fees Paid in Cash and $304,032 in Stock Awards in 2024 and beneficially owned 994,553 shares of ASPI stock worth approximately $10,035,039 at the time.

---

[1] The 2025 Proxy reported beneficial ownership of common stock as of October 27, 2025. According to publicly available market data, the price of ASPI common stock closed at $10.09 on that date. *ASP Isotopes, Inc. Stock Price & News*, MARKETWATCH, https://www.marketwatch.com/investing/stock/aspi.

17.     **Defendant Todd Wider** has served as a non-employee director since October 2021. According to the 2025 Proxy, Defendant Wider received $70,000 in Fees Paid in Cash and $304,032 in Stock Awards in 2024, and beneficially owned 710,230 shares of ASPI stock worth approximately $7,166,220 at the time.

18.     Defendants Mann, Ryan, Gorley, Moore, and Wider collectively served as members of ASPI's Board during the Relevant Period and are referred to herein as the "Director Defendants."

19.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.,* the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the duty to prevent their issuance or cause them to be corrected.

**Demand Futility Non-Parties**

20.     **Non-Party Director Ralph Hunter ("Hunter")** has served as a non-employee director of the Company since September 2025 and is named herein solely for the purposes of demand futility. According to the 2025 Proxy, Hunter participates in the non-employee director compensation program and beneficially owned 10,470 shares of ASPI stock worth approximately $105,642 at the time.

21.     **Non-Party Director Sipho Maseko ("Maseko")** served as a non-employee director of the Company beginning in April 2025 and is named herein solely for the purposes of demand futility. According to the 2025 Proxy, Maseko participates the non-employee director

compensation program and beneficially owned 22,422 shares of ASPI stock worth approximately $226,237 at the time.

## DUTIES OF CORPORATE GOVERNANCE

22.     By reason of their positions as officers, directors, and/or fiduciaries of ASPI and because of their ability to control the business and corporate affairs of ASPI, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

23.     Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

24.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public

information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

25.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

26.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

**The Code Of Business Conduct And Ethics**

27.    ASPI maintains a Code of Business Conduct and Ethics (the "Code of Conduct"), which states that "One of our Company's most valuable assets is its integrity.  Protecting this asset is the job of everyone in the Company."

28.    In an opening letter from Defendant Mann, the Company's Chairman and CEO, the Code of Conduct states that "[a]ll of the Company's officers, directors and employees must carry out their duties in accordance with the policies set forth in this Code and with applicable laws and regulations."

29.    In a section titled "Compliance with Laws and Regulations", the Code of Conduct provides the following, in relevant part:

The Company is committed to full compliance with the laws and regulations of the cities, states and countries in which it operates. You must comply with all applicable laws, rules and regulations in performing your duties for the Company. Numerous federal, state and local laws and regulations define and establish obligations with which the Company, its employees and agents must comply. Under certain circumstances, local country law may establish requirements that differ from this Code. You are expected to comply with all local country laws in conducting the Company's business. If you violate these laws or regulations in performing your duties for the Company, you not only risk individual indictment, prosecution and penalties, as well as civil actions and penalties, you also subject the Company to the same risks and penalties. If you violate these laws in performing your duties for the Company, you may be subject to immediate disciplinary action, including possible termination of your employment or affiliation with the Company.

30.    In a section titled "Fair Dealing", the Code of Conduct provides the following, in

relevant part:

You should endeavor to deal honestly with the Company's customers, suppliers, competitors and employees. Under federal and state laws, the Company is prohibited from engaging in unfair methods of competition, and unfair or deceptive acts and practices. You should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair dealing.

Examples of prohibited conduct include, but are not limited to:

- bribery or payoffs to induce business or breaches of contracts by others;
- acquiring a competitor's trade secrets through bribery or theft;
- making false, deceptive or disparaging claims or comparisons about competitors or their products or services; or
- mislabeling products or services.

31.    In a section titled "Accurate Business Records", the Code of Conduct provides:

Accurate and complete business records give our Company a comprehensive view of our operations and allows us to make well-informed business decisions. Keeping our records in order also helps us to build trust with our customers and our business partners. Each of us contributes to recordkeeping in some form and has a responsibility to be honest, accurate, and complete. One of the most common forms of recordkeeping with which all Company employees are concerned is timekeeping; it is important to record your time spent on projects and tasks accurately and in a timely manner. Furthermore, because it is a crime to knowingly make false statements or false claims to the U.S. and other

governments, employees who violate these standards could subject the Company and themselves to liability, damaging publicity, expensive and time-consuming audits and investigations, reduction in contract prices, and loss of government contracts. Moreover, the Company and individual employees may be subject to criminal or civil penalties (e.g., imprisonment, fines, and/or suspension and debarment from government contracting), in addition to being subject to disciplinary action, up to and including termination.

32.     The Code of Conduct further provides that:

. . . in the event of a violation of this Code, the manager and the Compliance Officer should assess the situation to determine whether the violation demonstrates a problem that requires remedial action as to Company policies and procedures. If a violation has been reported to the Audit Committee or another committee of the Board, that committee shall be responsible for determining appropriate remedial or corrective actions. Such corrective action may include providing revised public disclosure, retraining Company employees, modifying Company policies and procedures, improving monitoring of compliance under existing procedures and other action necessary to detect similar non-compliant conduct and prevent it from occurring in the future. Such corrective action shall be documented, as appropriate.

**The Audit Committee Charter**

33.     The Company also maintains an Audit Committee Charter (the "Audit Charter"), which states that the purpose of the Audit Committee is to:

 . . . oversee the accounting and financial reporting processes of the Company, the integrity of the financial reports and other financial information, the audits of the Company's financial statements, and the Company's compliance with legal and regulatory requirements. The Committee shall also review the qualifications, independence and performance, and approve the terms of engagement, of the Company's independent auditor and prepare any reports required of the Committee under rules of the Securities and Exchange Commission ("SEC").

34.     In a section titled "Authority and Responsibilities", the Audit Charter provides that the Audit Committee "shall have the following authority and responsibilities, subject to such modification and additional authority as the Board may approve from time to time…" These powers and responsibilities include, among other things:

11

**A. Oversight of the Company's Independent Auditor**

1. Be solely responsible for the appointment, compensation and retention of any independent auditor engaged by the Company for the purpose of preparing or issuing an audit report or related work and shall be directly involved in the oversight of such engagement (including resolution of disagreements between management and the independent auditor regarding financial reporting), and shall assure that each independent auditor shall report directly to the Committee.

2. Periodically review and discuss with the independent auditor (i) the matters required to be discussed by Auditing Standard No. 16, and (ii) any formal written statements received from the independent auditor consistent with and in satisfaction of Independence Standards Board Standard No. 1, as amended, including without limitation, descriptions of (x) all relationships between the independent auditor and the Company, (y) any disclosed relationships or services that may impact the independent auditor's objectivity and independence and (z) whether any of the Company's senior finance personnel were recently employed by the independent auditor.

3. Evaluate annually the qualifications, performance and independence of the independent auditor, including a review of whether the independent auditor's quality-control procedures are adequate and a review and evaluation of the lead partner of the independent auditor, taking into account the opinions of management and any internal auditors of the Company, and report to the Board on its conclusions, together with any recommendations for additional action.

4. Obtain and review annually a report from the independent auditor describing (i) the independent auditor's internal quality-control procedures, (ii) any material issues raised by the most recent internal quality-control review or peer reviews or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm, and any steps taken to deal with such issues, and (iii) all relationships between the independent auditor and the Company.

5. Consult with the independent auditor regarding the rotation of the lead audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit every five years, consider issues related to the timing of such rotation and the transition to new lead and reviewing partners, and consider whether, in order to assure continuing auditor independence, there should be regular rotation of the audit firm, and report to the Board on its conclusions.

6. Approve in advance the engagement of the independent auditor for all audit services and non-audit services, based on independence, qualifications and, if applicable, performance, and approve the fees and other terms of any such

engagement; provided, however, that (i) the Committee may establish pre-approval policies and procedures for any engagement to render such services, provided that such policies and procedures (x) are detailed as to particular services, (y) do not involve delegation to management of the Committee's responsibilities hereunder and (z) provide that, at its next scheduled meeting, the Committee is informed as to each such service for which the independent auditor is engaged pursuant to such policies and procedures, and (ii) the Committee may delegate to one or more members of the Committee the authority to grant pre-approvals for such services, provided that the decisions of such member(s) to grant any such pre-approval shall be presented to the Committee at its next scheduled meeting.

7. Meet with the independent auditor prior to the audit to discuss the planning and staffing of the audit.

8. Approve as necessary the termination of the engagement of the independent auditor and select a replacement independent auditor.

9. Establish policies for the hiring of employees or former employees of the independent auditor who participated in any capacity in the audit of the Company, taking into account the impact of such policies on auditor independence.

10. Regularly review with the independent auditor any significant difficulties encountered during the course of the audit, any restrictions on the scope of work or access to required information and any significant disagreement among management and the independent auditor in connection with the preparation of the financial statements. Review with the independent auditor any accounting adjustments that were noted or proposed by the independent auditor but that were "passed" (as immaterial or otherwise), any communications between the audit team and the independent auditor's national office respecting auditing or accounting issues presented by the engagement, any "management" or "internal control" letter or schedule of unadjusted differences issued, or proposed to be issued, by the independent auditor to the Company, and any other material written communication provided by the independent auditor to the Company's management.

11. Review with the independent auditor the critical accounting policies and practices used by the Company, all alternative treatments of financial information within accounting principles generally accepted in the United States ("GAAP") that the independent auditor has discussed with management, the ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the independent auditor.

**B. Review of Financial Reporting Policies and Processes**

To fulfill its responsibilities and duties, to the extent that it deems necessary or appropriate, and in addition to the items described above, the Committee shall:

1. Review and discuss with management and the independent auditor the Company's annual audited financial statements and any certification, report, opinion or review rendered by the independent auditor, and recommend to the Board whether the audited financial statements should be included in the Company's annual report on Form 10-K.

2. Review and discuss with management and the independent auditor the Company's quarterly financial statements.

3. Review and discuss with management and the independent auditor the Company's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" appearing in the Company's periodic reports.

4. Review and discuss with management press releases regarding the Company's financial results and any other information provided to securities analysts and rating agencies, including any "pro-forma," "non-GAAP" or adjusted financial information.

5. Review with management and the independent auditor any significant judgments made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments.

6. Review with management its assessment of the effectiveness and adequacy of the Company's internal control structure and procedures for financial reporting ("Internal Controls"), review with the independent auditor the attestation to and report on the assessment made by management, and consider whether any changes to the Internal Controls are appropriate in light of management's assessment or the independent auditor's attestation and report.

7. To the extent that it deems appropriate, review with management its evaluation of the Company's procedures and controls designed to assure that information required to be disclosed in the Company's periodic reports is recorded, processed, summarized and reported in such reports within the time periods specified by the SEC for the filing of such reports ("Disclosure Controls"), and consider whether any changes are appropriate in light of management's evaluation of the effectiveness of such Disclosure Controls.

8. Review and discuss with management and the independent auditor any offbalance sheet transactions or structures and their effect on the Company's

financial results and operations, as well as the disclosure regarding such transactions and structures in the Company's public filings.

9. Review with management and the independent auditor the effect of regulatory and accounting initiatives on the financial statements. Review any major issues regarding accounting principles and financial statement presentations, including any significant changes in selection of an application of accounting principles. Consider and approve, if appropriate, changes to the Company's auditing and accounting principles and practices as suggested by the independent auditor or management.

10. Review any analyses prepared by management or any independent or internal auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including the effects of alternative GAAP methods on the financial statements.

11. Review any special audit steps adopted in light of material control deficiencies. Review with the independent auditor and management the extent to which changes or improvements in financial or accounting practices, as approved by the Committee, have been implemented.

12. Review the appointment and replacement of the head of any internal audit function at the Company. Review and discuss with any internal auditors (i) the charter, purpose, authority and organizational reporting lines of the internal audit function and (ii) the annual audit plan and changes to the audit plan. Review reports to management and the Board prepared by any internal auditors. Consult with management and the head of internal audit function the responsibilities, budget and staffing of the internal audit function and the planning and execution of internal audit activities.

**C. Risk Management, Related Party Transactions, Legal Compliance and Ethics**

To further fulfill its responsibilities and duties, and in addition to the items described above, the Committee shall:

1. Review with the chief executive officer and chief financial officer of the Company any report on significant deficiencies in the design or operation of the Internal Controls that could adversely affect the Company's ability to record, process, summarize or report financial data, any material weaknesses in the Internal Controls identified to the auditors, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Internal Controls.

2. Review and approve any transactions between the Company and any related parties (as defined in Item 404 of Regulation S-K) and any other potential conflict of interest situations on an ongoing basis.

3. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. Adopt, as necessary, appropriate remedial measures or actions with respect to such complaints or concerns.

4. In consultation with the Nominating and Corporate Governance Committee, review and recommend to the Board for adoption any revisions to the Company's Code of Conduct (the "Code"), which meets the requirements of Item 406 of the SEC's Regulation S-K, and provide for prompt disclosure to the public of any change in, or waiver of, the Code, and adopt procedures for monitoring and enforcing compliance with the Code.

5. As requested by the Board, review and investigate conduct alleged by the Board to be in violation of the Code, and adopt as necessary or appropriate, remedial, disciplinary, or other measures with respect to such conduct.

6. Discuss with management and the independent auditor any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.

7. Discuss guidelines and policies to govern the process by which risk assessment and management is undertaken and handled. Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

8. Review with the Company's general counsel or outside legal counsel and report to the Board on litigation, material government investigations and compliance with applicable legal and regulatory requirements (including policies and practices designed to ensure compliance therewith) and the Code. As requested by the Board, oversee compliance audits or assessments, including evaluating findings and recommendations and management responses and action plans.

9. Prepare the Committee's report required by the rules of the SEC to be included in the Company's annual proxy statement.

10. Develop, in coordination with the Nominating and Corporate Governance Committee, and implement an annual performance evaluation of the Committee.

11. Regularly report to the Board on the Committee's activities, recommendations and conclusions.

12. Review and reassess the adequacy of this Charter at least annually and recommend any proposed changes to the Board for approval.

**The Corporate Governance Guidelines**

35. The Company also maintains Corporate Governance Guidelines (the "Guidelines"), which state that they are intended to "assist and guide the Board in the exercise of its responsibilities."

36. In a section titled "Role and Responsibility of the Board", the Guidelines provide the following:

> The Board directs and oversees the management of the business and affairs of the Company in a manner consistent with the best interests of the Company. In addition to this oversight function, the Board serves as the ultimate decision-making body of the Company, except for those matters reserved to or shared with the Company's stockholders. The Board selects and oversees the members of the Company's senior management, who are charged by the Board with conducting the day-to-day business of the Company.

37. In a section titled "Contact with Management", the Guidelines provide the following:

> All directors are invited to contact the CEO at any time to discuss any aspect of the Company's business. Directors also have complete access to other members of Management and to the Company's employees. Contact by directors with employees other than senior management of the Company should be arranged through the CEO or the Chairperson. The Board expects that there will be frequent opportunities for directors to meet with the CEO and other members of Management in Board and committee meetings and in other formal or informal settings.

## SUBSTANTIVE ALLEGATIONS

**Overview of ASPI's Business**

38. ASPI is a development stage advanced materials company dedicated to the production of natural isotope enrichment technologies, with the ultimate goal of supplying enriched

isotopes to the medical, semiconductor, and nuclear energy markets.

39.    During the Relevant Period, ASPI positioned uranium enrichment, and in particular the production of HALEU, as a core pillar of its corporate strategy, public messaging, and capital raising efforts. That strategic positioning carried exceptional technical, regulatory, and financial significance. Uranium enrichment is among the most complex and highly regulated industrial processes in the nuclear energy supply chain, and successful participation requires demonstrated, uranium-specific validation before claims of scalability, cost competitiveness, or commercial readiness can reasonably be made.

40.    Uranium enrichment is a process by which different isotopes of the same element are separated based on their physical properties. Naturally occurring uranium consists primarily of the isotope uranium-238, which cannot sustain a nuclear chain reaction, and a small fraction of the isotope uranium-235, which is capable of supporting such reactions and is essential for commercial nuclear applications including the generation of nuclear power. Enrichment is therefore a necessary step in transforming mined uranium into usable nuclear fuel.

41.    HALEU refers to uranium enriched to a concentration of uranium-235 above the levels used in conventional light-water reactors, but below the threshold for weapons-grade material. HALEU is viewed as a critical input for certain advanced nuclear reactor designs, including small modular reactors ("SMRs"), and its production is subject to heightened regulatory scrutiny, specialized handling requirements, and materially greater technical and safety constraints than conventional low-enriched uranium.

42.    The established commercial technique is gas-centrifuge enrichment, which relies on large-scale cascades of centrifuges operating in sequence to achieve sufficient levels of enrichment for downstream nuclear applications. The technical complexity, regulatory sensitivity,

and financial barriers associated with uranium enrichment have historically limited the industry to a small number of large, often government-backed entities that control the global supply of enriched uranium. These barriers shape the competitive landscape and impose significant constraints on new market entrants seeking to develop alternative enrichment technologies.

43.    ASPI sought to enter the uranium enrichment market by acquiring and developing proprietary isotope separation technologies not based on gas-centrifuge enrichment. Indeed, ASPI was incorporated in September 2021 for the specific purpose of acquiring and commercializing the Aerodynamic Separation Process ("ASP"), an isotope separation technology developed by Klydon, a South Africa-based research-and-development company.

44.    ASPI acquired Klydon. At the time of acquisition, Klydon was financially distressed and its operations had largely ceased.  ASPI acquired certain Klydon assets through a "business rescue" process, which Defendant Mann describes as "basically the South African version of bankruptcy." Beginning in September 2019, Klydon was investigated by a forensic accountant working on behalf of a Klydon investor.  Securities Class Action, ECF No. 28 ¶24 For six weeks, the forensic accountant investigated Klydon, interviewed its leaders and members of its finance team, reviewed financial reports, investor agreements, and other documentation. The forensic accountant reported that when they investigated Klydon in 2019, "very little was happening. The project had effectively stopped — which is why [the investor] wanted an investigation done there." *Id*.  Over the course of 2022 and 2023, ASPI consolidated control over Klydon's assets and intellectual property, ultimately acquiring all of Klydon's business interests and technology.

45.    ASPI's representations during the Relevant Period centered on two distinct technologies: (i) Klydon's ASP, which ASPI promoted as an isotope-separation method potentially

applicable to uranium isotopes; and (ii) a laser-based method ASPI referred to as "Quantum Enrichment" ("QE"), which ASPI positioned as another pathway for uranium enrichment and HALEU production.

46.    ASPI described QE as a process that selectively photoionizes isotopes using precisely tuned lasers and then separates them using electric fields. In responding to investor and analyst inquiries, ASPI's CEO, Defendant Mann, acknowledged that QE is derived, at least in part, from Atomic Vapor Laser Isotope Separation ("AVLIS"), a historical laser-based uranium enrichment approach that was researched extensively by governments but ultimately abandoned as commercially nonviable.

47.    ASPI's public statements repeatedly suggested that demonstrated enrichment of non-uranium isotopes using these technologies supported the feasibility, scalability, and commercial viability of uranium enrichment.

48.    In the uranium context, however, enrichment feasibility depends not merely on theoretical separability, but on the ability to scale production at commercially competitive costs.

49.    As alleged below, despite publicly promoting ASP and QE as viable solutions for uranium enrichment and HALEU production, ASPI had never tested either technology on uranium, even at a laboratory or pilot scale, and lacked any empirical data demonstrating that its enrichment approaches could function, scale, or compete in the uranium enrichment market.

**ASPI Did Not Generate Revenue from Isotope Production or Uranium Enrichment**

50.    ASPI completed its initial public offering on November 15, 2022, selling 1.25 million shares of common stock for $4.00 each, raising gross proceeds of $5 million.

51.    Throughout much of its history, ASPI generated little or no revenue, and incurred large losses as detailed in the following chart:

|  | 2021[2] | 2022 | 2023 | 2024 |
|---|---|---|---|---|
| Revenue | $0 | $0 | $433,026 | $3,944,226 |
| Net Loss | $2,607,927 | $4,945,139 | $16,286,234 | $35,113,240 |

52.     The revenue reported by ASPI beginning in 2023 was not generated through the production and sale of isotopes, but rather by ASPI's ownership interest in Pet Labs Pharmaceuticals Proprietary Limited ("PET Labs").  In October 2023, ASPI entered into an agreement to purchase 51% of the shares of PET Labs for an aggregate price of $2 million. In a press release issued on October 29, 2023, which was later filed with the SEC as an exhibit to a Form 8-K on November 3, 2023, ASPI described PET Labs as:

> a South African radiopharmaceutical operations company dedicated to nuclear medicine and the science of radiopharmaceutical production. PET Labs focuses on the production of fluorinated radioisotopes and active pharmaceutical ingredients. PET Labs currently operates a single cyclotron in Pretoria, South Africa.

53.     ASPI later admitted in its Annual Report on Form-10K for the year ended December 31, 2024 (the "2024 10-K") that it had "not generated any revenue to date attributable to isotopes (and only limited revenues attributable to PET Labs), and we continue to incur significant research and development and other expenses related to our ongoing operations. As a result, we are not profitable and have incurred losses since our inception in September 2021."

54.     ASPI's auditor, EisnerAmper LLP, in connection with the Company's Annual Report on Form 10-K for the year ended December 31, 2023 (the "2023 10-K"), stated that "the Company has incurred recurring operating losses and negative cash flows from operating activities that raise substantial doubt about its ability to continue as a going concern." The 2023 10-K further stated:

> Until such time as we can generate significant revenue from sales of our future isotopes or nuclear medical doses for PET scanning, if ever, we expect to

---

[2] 2021 income figures are for ASPI's inception on September 13, 2021, to December 31, 2021.

finance our cash needs through public or private equity or debt financings or other capital sources, including potential collaborations, licenses and other similar arrangements. However, we may be unable to raise additional funds or enter into such other arrangements when needed on favorable terms or at all.

## MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

55.    Leading up to and during the Relevant Period, the Individual Defendants repeatedly emphasized the key importance of uranium enrichment to ASPI. The Individual Defendants also touted Uranium Enrichment as a Core Operation for ASPI.  However, the Individual Defendants made multiple statements that misleadingly represented and/or omitted to disclose that neither ASPI, nor its predecessor Klydon, had ever experimented with or tested its technology on uranium. These undisclosed facts stand in stark contrast to the Individual Defendants' misleading public statements during the Relevant Period.

### The Individual Defendants Touted Uranium Enrichment as a Core Operation for ASPI

**September 26, 2024 – Presentation**

56.    On the morning of September 26, 2024, ASPI filed with the SEC a Form 8-K current report signed by Defendant Mann, that attached as an exhibit a presentation titled "ASP Isotopes Corporate Overview." On that same day, Defendant Mann participated in a presentation hosted by the Emerging Growth Conference, in which he gave prepared remarks while presenting the slide deck filed with the SEC, and then responded to questions (the "September Presentation").

57.    .[3] A copy of the September Presentation was also made available on ASPI's website at the time.

_____

[3] *See*, Emerging Growth Conference, *ASP Isotopes Inc. (NASDAQ: ASPI)*, YouTube (Sept. 26, 2024), https://www.youtube.com/watch?v=wm8VJNQ0-Ek.

58.     In the September Presentation, ASPI prominently featured "Nuclear Energy," and the enrichment of uranium specifically as one of three areas of focus for the Company, along with nuclear medicine and enrichment of silicon-28 for semiconductor manufacturing. The September Presentation highlighted the potential for soaring demand for enriched uranium, as governments around the world seek to reduce their greenhouse gas emissions. The September Presentation stated that "Uranium supply has been in a state of sustained deficit since 2018," and the slides also showed that prices for uranium enrichment had more than doubled over the last four years.

59.      The September Presentation contained a slide explaining that "QE separates two isotopes by taking advantage of the slight differences in the transition energy between two isotopes. This method is described as a 'quantum mechanics' method." The slide further explained that "In principle, Quantum Enrichment can separate isotopes of most elements, achieving desired enrichment in a single step." The slide further explained that the QE method utilizes a laser, which can be precisely tuned to an isotope's "spectrum" which then allows those atoms to be "selectively photoionized and then electrically separated based on their electric charge."

60.     Page 28 of the September Presentation bears the heading "Comparing and Contrasting Enrichment Methods" This page compares multiple uranium enrichment technologies, — Gaseous Diffusion, Centrifugation, AVLIS, Separation of Isotopes by Laser Excitation, and Quantum Leap Energy LLC ("QLE") (that is a subsidiary of ASPI), across various performance metrics. The chart measures: (i) relative capital cost; (ii) operating speed; (iii) key technological characteristics; (iv) "Selectivity" *i.e.*, the enrichment factor achieved in a single pass; (v) energy consumed per separative work unit ("SWU"); and (vi) the approximate number of stages required to reach reactor-grade enrichment. The slide represents QLE's enrichment technology as a method that outperforms all the other listed methods, with a high single-pass selectivity ($\alpha \geq 50$), energy

usage at around 40 kWh per SWU, and the need for only a single enrichment stage. The chart further indicates that QLE operates on U Metal 3000K.

61.     Defendant Mann also stated the following, in relevant part with respect to page 28 of the slide deck:

> this kind of contrasts and compares different types of enrichment and you'll see **the most important line here is the selectivity line, the alpha** *line*, and so the selectivity for centrifuge, it's about 1.15. And so that's good, and . . . when you put it into a cascade, you compound that 1.15 across the cascade, and that gives you your desired enrichment. But for quantum leap or quantum enrichment, selectivity is greater than 50. And here's an example of quantum enrichment in a real world application. This is Lithium 6 and lithium 7, so you'll see in the top chart there. That's Lithium 6 is at 7% and Lithium 7 is at 93% and after a single pass through our enrichment chamber, the Lithium 6 is now over 90%. And so that's an enrichment factor of 112. *So when we say greater than 50, we mean substantially greater than 50.* **(Emphasis added).**

62.     The statements identified in page 28 of the September Presentation were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as the Individual Defendants knew or recklessly disregarded, the Individual Defendants had no reasonable basis to make claims about the enrichment selectivity or energy required per SWU[4] for quantum enrichment of uranium, because they had never attempted to use any ASPI technology on uranium.

63.     Page 29 of the September Presentation has the heading "Quantum Enrichment: Real World Experience" and states:

> Our team have [sic] used lasers to enrich many different metals:
> - Uranium
> - Lithium (the only isotopes where results have been published)
> - Zirconium
> - Zinc

---

[4] A separative work unit is the standard measure of the effort required to separate U-235 and U-238. It is measured in unites of kilograms and can then be used to determine cost per SWU and kWh (kilowatt hour) per SWU.

64.     The materials identified in page 29 of the September Presentation were materially false and/or misleading, and/or failed to disclose material adverse facts, the omission of which rendered those statements misleading because, as the Individual Defendants knew or recklessly disregarded, neither ASPI nor its predecessor Klydon had any real-world experience enriching uranium with lasers or otherwise. As later admitted by Defendant Mann, "[t]he team have done it in the day, 20-30 years ago."

65.     Page 32 of the September Presentation is titled "Potential to Close the Loop on Nuclear Waste" and states "Depleted tails from other uranium enrichers produce nuclear waste. The management of this waste is becoming a problem. We believe that our technology can process this waste into HALEU." The page also presents a table showing that ASPI's work on uranium-235 using both quantum enrichment and ASP technology is currently in the "R&D Stage."

66.     The statements identified in page 32 of the September Presentation were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as the Individual Defendants knew or recklessly disregarded: (i) the Individual Defendants had no reasonable basis for the professed belief that ASPI's technology can process depleted uranium tails into HALEU, because the Individual Defendants had never attempted to use any ASPI technology on uranium, let alone depleted tails; and (ii) ASPI's quantum enrichment and ASP technologies as applied to uranium-235 were entirely theoretical and lacked any real-world research and development.

67.     Page 33 of the September Presentation is titled "Investment Overview" and states under the sub-heading "Proven Proprietary Technology" that "ASPI's advanced technologies leverage 20 years of R&D history to enrich isotopes in varying levels of atomic mass, allowing it to meet the growing demand in the Nuclear Medicine, Semiconductors, and Nuclear Energy

industries."

68.     The statements identified in the page 33 of the September Presentation were materially false and/or misleading and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as the Individual Defendants knew or recklessly disregarded, ASPI's technology was not "proven" with respect to the nuclear energy industry because ASPI had never worked with uranium, and its technology had never been tested on uranium.

### The October 17, 2024, Press Release Regarding Commissioning of Quantum Enrichment Plant

69.     On October 17, 2024, ASPI published a press release titled "ASP Isotopes Inc. Enriches Ytterbium-176 During Commissioning Phase of First Quantum Enrichment Facility and Expects to Offer Highly Enriched Ytterbium-176 for Commercial Sale in 2025." Later that day, ASPI filed a copy of the press release as an exhibit to a Form 8-K signed by Defendant Mann.

70.     The press release "announced the successful enrichment of Ytterbium-176 using Quantum Enrichment, a novel laser isotope enrichment technique," and stated that:

> The Company believes that this proprietary technology is not only more efficient and scalable than other enrichment technologies, but also has considerable advantages with respect to capital efficiency and industrial pollution. Additionally, ASP Isotopes believes that because of this milestone achievement it is likely that other important isotopes can be produced using the Quantum Enrichment technology with the same benefits.

71.     The press release further stated that "ASPI believe its Quantum Enrichment process will be able to produce HALEU (High Assay Low Enriched Uranium) at an attractive price, allowing new nuclear energy to become available at a 'green discount' to carbon-intensive electricity production processes."

72.    The October 17 press release was materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as the Individual Defendants had no reasonable basis for the professed belief that quantum enrichment technology would be able to produce HALEU at an attractive price, because the Individual Defendants had never attempted to use ASPI's technology on uranium.

**October 30, 2024 Press Release Regarding Term Sheet With TerraPower For Construction of HALEU Production Facility**

73.    On the morning of October 30, 2024, ASPI published a press release titled "ASP Isotopes Inc. enters into Term Sheet with TerraPower, LLC for Construction of a HALEU Production Facility." Later that day, ASPI filed a copy of the press release with the SEC as an exhibit to a Form 8-K signed by Defendant Mann.

74.    The press release stated ASPI "has entered into a term sheet with TerraPower, a nuclear innovation company and advanced nuclear energy developer, related to the construction of a uranium enrichment facility capable of producing High Assay Low-Enriched Uranium (HALEU) and the future supply of HALEU to TerraPower, as a customer of Quantum Leap Energy LLC (QLE)."

75.    The press release also stated that "the parties anticipate entering into a long-term supply agreement for the HALEU expected to be produced at this facility pursuant to which the customer would purchase all the HALEU produced at the facility over a 10-year period after the expected completion of the facility."

76.    The press release continued that ASPI "believes that its enrichment technologies can be deployed in a new HALEU facility for considerably lower capital costs, and in much less time, compared to the construction of an enrichment facility using a traditional centrifuge process of HALEU production."

27

77.    The press release quoted Defendant Mann stating "Over the last several decades, the scientists at ASP Isotopes have developed some of the world's most advanced isotope enrichment technologies. This term sheet is further validation of our belief that ASP Isotopes can offer scalable and capital efficient technology solutions to the supply challenges which exist in global isotope markets.

78.    The above statements were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as the Individual Defendants knew or recklessly disregarded, there was no reasonable basis for their purported belief that ASPI could construct a commercially viable HALEU facility, and would produce commercial quantities of HALEU, given that Defendants had never attempted to use ASPI's technology on uranium.

**The October 30, 2024 Conference Call**

79.    On the morning of October 30, 2024, Defendant Mann spoke on an ASPI conference call hosted by the Emerging Growth Conference, in which he gave prepared remarks while presenting ASPI's corporate overview slide deck, and then responded to questions.[5] Mann's prepared remarks were similar to the misleading statements he made on the September 26, 2024 conference call.

80.    During the question-and-answer section, the host relayed a listener's question "Is criticality an issue with your QE process enriching U-235?" Mann replied in relevant part:

> So, criticality is the problem in any enrichment process involving U-235. You have to demonstrate to the regulators and to the people who provide your license you'll never going to be able to hit criticality. One of the advantages of our QE process is that we do it in batches, so rather than having a continuous process of hundreds of kilograms of product inside the plant at a time, you only have a

_____

[5] *See*, Emerging Growth Conference, *ASP Isotopes Inc. (NASDAQ: ASPI)*, YouTube (Oct. 30, 2024), https://www.youtube.com/watch?v= DVtbArRkOQ.

small amount of product being enriched at a time. And so we believe we can demonstrate very clearly to regulators that there's no chance of hitting criticality.

81.     The statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as the Individual Defendants knew or recklessly disregarded, ASPI had never used its' quantum enrichment process, or any process, on uranium. In other words, Defendant Mann falsely stated that ASPI presently possessed an operational process to enrich U-235 in a manner that is compliant with regulatory safety standards — when in truth, ASPI had never even used any process on uranium.

### November 19, 2024, POWER Magazine Interview

82.     On November 19, 2024, POWER Magazine published an article on its website titled: "Mobility, Flexibility, Scalability: SMRs Forging Nuclear's Future," which included an interview with ASPI's vice president of fundraising and business development, Viktor Petkov.

83.     In response to the question "What current technology is your company working on with regard to supporting the market for SMRs?", Petkov replied in relevant part "[ASPI] is focusing on producing critical nuclear fuels necessary for the operation of small modular reactors. These include HALEU (High-Assay Low-Enriched Uranium), Lithium-6 and Lithium-7, Chlorine-37, and Thorium Fluoride."

84.     The interviewer then asked, "[d]o you have a timeline for commercial operation of your technology?", Petkov replied:

*Our technology is fully prepared for deployment*, pending the necessary approvals to operate an isotope enrichment facility. We are targeting 2025/2026 for the production of Lithium-6 and Lithium-7. ASPI is actively engaged in discussions with multiple governments to secure authorization for the construction of a uranium enrichment plant, which will produce HALEU. Once the required permits are obtained, we anticipate that the facility could be operational within 12 to 18 months.

85.     The statements identified above were materially false and/or misleading, and/or failed to disclose material adverse facts the omission of which rendered those statements misleading because, as the Individual Defendants knew or recklessly disregarded, ASPI was not currently working on uranium with its technology and never had, so its technology was not prepared for commercial deployment. Indeed, since ASPI had never successfully enriched uranium using QE and lacked the regulatory approvals to even test its QE technology, it could not operate a uranium enrichment facility.

**November 22, 2024 Revised Investor Presentation**

86.     On November 22, 2024, ASPI published a revised version of the September 26, 2024, investor presentation (the "November Presentation"). The November Presentation was nearly identical to the September 26, 2024 version, except it removed page nine, which was titled "QE Technology: Illustrative Laser System," that contained pictures of lasers and laboratory equipment.

87.     The November Presentation contained the same materially false and misleading statements as the September Presentation as the Individual Defendants had no reasonable basis for their professed belief that quantum enrichment technology provides an ideal solution for HALEU supply, or even a perfect solution for enriching uranium, because the Individual Defendants never even attempted to use ASPI's technology on uranium.

**False and Misleading Statements in the 2024 Proxy**

88.     In order to solicit stockholder votes for re-election of Defendants Gorley and Moore, and for approval of an Equity Incentive Plan attached to Quantum Leap Energy, the Individual Defendants caused ASPI to file the proxy statement with the SEC on October 21, 2024 (the "2024 Proxy"). The 2024 Proxy contained a series of false and misleading statements.

### A.    The 2024 Proxy Presented a Misleading Picture of the Board's Risk Oversight

89.    In the 2024 Proxy, the Company affirmatively represented that the Board took an "active role" in overseeing the Company's key operational, regulatory and strategic risks, that the Board regularly reviewed information concerning these risks, and that the Board was exercising meaningful oversight over the Company's purported efforts to commercialize advanced nuclear fuels and uranium enrichment.

90.    Further, the 2024 Proxy discussed the Board's commitment to the Company's corporate governance, stating in part:

> We are committed to maintaining strong corporate governance practices that drive effective functioning of the board of directors in its oversight role, promote the long-term interests of our stockholders and strengthen board and management accountability. Our governance practices are documented in our corporate governance guidelines, which address the role and composition of our board of directors and the functioning of the board and its committees. You can find our governance documents, including our corporate governance guidelines and our code of business conduct and ethics, on our website www.aspisotopes.com under "Investor — Governance — Committee Charters" and "Investor — Governance — Governance Documents." Our board regularly reviews and updates our governance materials in light of legal and regulatory requirements, evolving best practices and other developments.

91.    The 2024 Proxy contains a report from the Audit Committee, which incorporated by reference the Company's 2023 10-K. The Audit Committee report states that the Audit Committee "oversees the Company's financial reporting process on behalf of the Company's board of directors," that the Audit Committee "reviewed and discussed with management the audited financial statements for the fiscal year ended December 31, 2023," held a discussion "of any significant changes in the selection or application of accounting principles, the reasonableness of significant judgments, the clarity of disclosures in the financial statements and the effect of any

new accounting initiatives," that the Audit Committee met with an independent auditor to discuss the board's internal controls and quality of financial reporting.

92.     As alleged herein, these representations were materially misleading because the Individual Defendants failed to exercise effective oversight over the Company's key operational risks. At the time the 2024 Proxy was issued, the Individual Defendants knew or recklessly disregarded that: (1) ASPI's public claims regarding the commercialization of HALEU and related enrichment technologies rested on speculative assumptions rather than demonstrated operational capability; (2) QLE the facilities, personnel, regulatory approvals, and binding commercial arrangements necessary to develop or commercialize activities described to investors in the 2024 Proxy; and (3) key milestones were contingent on non-binding memoranda of understanding and aspirational timelines, not executable business plans.

93.     By portraying Board oversight as active and effective while omitting these facts, the 2024 Proxy created a materially misleading impression of the governance processes stockholders were asked to rely upon when voting to re-elect the Director Defendants.

### B.    *The 2024 Proxy Mischaracterized Quantum Leap Energy as a Functioning Commercial Entity.*

94.     The 2024 Proxy stated that "QLE was formed in September 2023 as a wholly owned subsidiary of the Company to focus on the development and commercialization of advanced nuclear fuels, such as High-Assay Low Enriched Uranium (HALEU) and Lithium-6." The 2024 Proxy later went on to imply that QLE was capable of functioning as a commercial entity, stating that "future production of isotopes is limited to member countries of the Nuclear Suppliers Group."

95.     The 2024 Proxy also sought to solicit stockholder approval of an Equity Incentive Plan regarding QLE. The 2024 Proxy stated that the purpose of the Equity Plan was to "advance the interests of QLE, [ASPI] and the stockholders of [ASPI] by providing equity interests in QLE

to persons performing services for QLE, including employees, officers, directors/managers and consultants of QLE (who may also be employees, officers, directors and consultants of [ASPI])]" or, in other words, the Individual Defendants themselves.

96.    The 2024 Proxy's proposed Equity Incentive Plan framed QLE as a viable commercial entity, stating that the Equity Incentive Plan would "advance the interests of QLE and the Company by providing an incentive program that will enable the Company to attract and retain employees, consultants and directors and to provide them with an equity interest in the growth and profitability of QLE."

97.    In reality, at the time they solicited approval of QLE's Equity Incentive Plan, the Individual Defendants knew that QLE had never tested its technologies on uranium, lacked any meaningful physical operating presence or licensed enrichment facilities at its registered address, lacked authorization from the Nuclear Regulatory Commission (or any regulatory body for that matter) to engage in uranium enrichment, and relied entirely on non-binding contracts.

98.    The 2024 Proxy failed to disclose these facts. Instead, the Individual Defendants caused ASPI to materially overstate the maturity, legitimacy, and business prospects of QLE in order to solicit stockholder approval for their Equity Incentive Plan.

**The Truth Emerges**

99.    On November 26, 2024, Fuzzy Panda published an online report titled: "ASP Isotopes (ASPI): Failed Tech + Paid Stock Promotion + 'Microcap Fraudsters' = Nuclear Meltdown" (the "The Fuzzy Panda Report"). The Fuzzy Panda Report included interviews with nuclear energy industry executives as well as consultations with an applied physicist – which revealed significant problems with ASPI's claimed uranium enrichment technology.

100.    The Fuzzy Panda Report quoted a "TerraPower Former Executive in Procurement" who was asked "[w]ho would you rank at the bottom [in terms of quality]?" The executive replied: "Probably ASP Isotopes . . . [ASPI] still have to build the manufacturing facility. [ASPI] still [has] to quality the process. **ASPI is missing the manufacturing; They are missing the processes as well**; They still have to develop the HALEU . . . the most important part." (Emphasis in the original).

101.    The Fuzzy Panda Report also quoted a "TerraPower Former Executive" who opined that ASPI's projected timeline is "**too optimistic. And not real** . . . That's my view on it. . . I've worked on real projects, and I've seen how things work." (Emphasis in the original).

102.    The Fuzzy Panda Report quoted a "Former Centrus C-Level Executive" who stated, "We could have bought [ASPI] for a couple million, and we didn't think it was worth it. So, at $500 million [market cap], you're scratching your head."

103.    The Fuzzy Panda Report also cited a former employee of Klydon, who stated that "they told us that Klydon had also tried and failed at selling the tech to Cameco. The former Klydon employee told us Cameco's scientists were 'very skeptical of the technology' and Cameco 'did NOT think it would work on uranium'."[6]

104.    The Fuzzy Panda Report further revealed that ASPI's quantum enrichment technology appears to be based on AVLIS (atomic vapor isotope separation), a failed enrichment method that was previously researched by various governments around the world but discontinued

---

[6] Cameco, based in Canada, is one of the world's largest uranium mining companies, with over 35 years of experience, billions of dollars in annual revenue, and hundreds of millions of pounds of mineral reserves. Cameco is also the 49% owner of Global Laser Enrichment LLC, a U.S.-based company researching laser technology for uranium enrichment, which has commenced demonstration testing to validate large-scale enrichment performance, and expects to generate hundreds of kilograms of enriched uranium.

after billions of dollars of investment failed to produce desired results. The Fuzzy Panda Report showed that ASPI's illustration of quantum enrichment technology that it used in investor presentations was simply a recreated illustration of AVLIS technology from a 2008 U.S. Nuclear Regulatory Commission report.

105.    The Fuzzy Panda Report also asked an "applied physicist who recently worked at Los Alamos National Laboratory" to explain the fundamental flaws with AVLIS technology, and quoted the physicist stating "Quantum laser enrichment requires uranium in a gas form. The temperature required to make uranium a gas will damage other sensitive parts of the experiment such as . . . the parts used for separating the gaseous uranium."

106.    The Fuzzy Panda Report further explained:

> The fundamental issue with an AVLIS-based technology is that it requires uranium metal as a feedstock, as opposed to uranium hexafluoride (UF6) which is a gas and is used as the feedstock in all other current enrichment technologies. Uranium metal causes many challenges because ASPI needs to vaporize the metal at an extreme temperature of 3,400°C. Atomic vapor is extremely corrosive and has been shown to destroy the material within the separator device. When the U.S. Government set up an AVLIS pilot plant, the vapor destroyed the equipment within the separator device and required refurbishing the separator every 400 hours (22 times a year), making it costly and uneconomical.

107.    The Fuzzy Panda Report quoted Dr. Michael Goldsworthy, CEO of Silex Systems Limited and Inventor of its Separation of Isotopes by Laser Excitation ("SILEX") technology, as stating that "I can't see any different way to do AVLIS . . . AVLIS will take lots of time and money to do again . . . I have very low hopes for ASPI."[7]

---

[7] Silex Systems Limited is the 51% owner of Global Laser Enrichment LLC ("GLE"). The SILEX technology being developed by GLE has significant differences to ASPI's proposed quantum enrichment technology, including that SILEX uses uranium hexafluoride gas a feedstock, instead of needing to vaporize pure uranium metal at extremely high temperature.

108.    In the afternoon on November 26, 2024, ASPI issued its first public response to the Fuzzy Panda Report. Individual Defendants' only response in its brief press release addressing the claims made by Fuzzy Panda Research was that "[b]ased upon ASP Isotopes's and its legal counsel's preliminary review and evaluation of the report, the Company believes the report includes speculative conjecture and claims that are inaccurate or filled with innuendo in an attempt to mislead investors about ASP Isotopes's technology, leadership and future growth." In other words, Defendants did little more than cast vague aspersions, but failed to dispute any of the Fuzzy Panda Report's claims, and failed to provide any information to support Individual Defendants' prior misleading statements regarding the use of ASPI's technology for uranium enrichment.

109.    On this news, ASPI's share price fell $1.80 as compared to the prior day closing price, or 23.5%, to close at $5.85 per share on November 26, 2024, on heavy trading volume.

**Defendant Mann's November 27, 2024 Interview With Canaccord Genuity**

110.    On November 27, 2024, Defendant Mann participated in an interview with Canaccord Genuity Analyst George Gianarikas, in an attempt to respond to the Fuzzy Panda Report. During the interview, Gianarikas asked, "[s]o we'll get to TerraPower in a second, but to the extent TerraPower wants to use, just assume this for the sake of the argument, only use ASP for its HALEU needs, right? One reactor will need tens if not hundreds of modules from ASP." Defendant Mann responded in relevant part: "Yes, we don't actually know the exact number yet because ***we haven't actually enriched uranium***. And so until we've actually tried the process out with uranium and worked out an enrichment factor . . . difficult for us to know exact numbers." (Emphasis added).

111.    During this same interview, while on the topic regarding ASPI's memorandum of understanding with TerraPower and TerraPower's due diligence into ASPI's technology, the following exchange took place:

> Gianarikas: So anyone who's signing an MOU like this has looked at the results of what you've done, sort of at a lab scale in enriching uranium, which you've done at a lab scale, right?

> Mann: We've actually got commercial plants as well. So we've got three commercial plants in South Africa that are enriching today.

> Gianarikas: But I'm referring to uranium only.

> Mann: Say again?

> Gianarikas: I'm referring to uranium only. I'm not talking about the other . . .

> Mann: I mean, again, you know, we need to get a license before we're able to test our processes on the uranium . . . we need to get into Pelindaba and start working on uranium before we know definitively how, what the process looks like. But you know we have a very good idea. The team have done it in the day, 20-30 years ago, so they'll be able to do. But I mean again we are enriching isotopes today so people can look at [unintelligible]

> Gianarikas: So what would TerraPower base their optimism on then?

> Mann: I guess, we show enrichment of isotopes in all our plants and how we do it. And they have experts, they may have experts who have done it as well, maybe they were involved in the AVLIS program, maybe they've been down to visit us. So . . . based on that.

112.    The interview also approached whether ASPI's technology was based on the failed AVLIS enrichment method. Gianarikas asked: "Is your quantum enrichment process based on AVLIS enrichment technology?" Defendant Mann admitted that it was, at least in part, but failed to distinguish any difference between AVLIS and ASPI's technology, and failed to identify any work ASPI had done with uranium experiments, stating in part:

> That's, a little bit, but not really. That's a bit like saying it is a car today in 2024 based on a car in 1990 . . . AVLIS we feel was a very simple, very simplistic we feel. So the spectroscopy we use is a lot more complex than what AVLIS

used. We have a team of scientists who work on spectroscopy, working out what wavelengths we have to use to ionize particular isotopes. And it means we can ionize isotopes that aren't necessarily [unintelligible] ground state, which is where a problem of AVLIS was. The beam shaping has changed a lot over the last 20 years, 30 years. We have a very sophisticated group of scientists at [unintelligible] University who do our beam shaping for us. And the lasers have changed a lot as well. Back in the AVLIS day people used copper vapor lasers, whereas now you know the lasers are much more powerful, have much higher repetition rates and you know they're very different. So there's a number of differences between what AVLIS was and what we do today. They're both laser based technologies though, but they're somewhat different.

113.    In a follow-up question regarding whether ASPI did improve on AVLIS technology, Gianarikas asked, "And how did you develop on AVLIS, or the Company or South Africa do that as its enrichment industry sort of remained dormant, for at least from what my understanding is for a while, how did you improve on something when you really, I guess, allegedly weren't working on it?" Defendant Mann, replied:

You know, we've actually hired out of retirement quite a lot of the team who were involved in the enrichment back in the day. So one of our one of our main scientists, he's 73. He retired 10 years ago and we've hired him back . . . We hired a lot of those people back again. You know, and I think for a lot of them, you know, back in the 90s kind of the rug got pulled from under their feet, they suddenly stopped having to do they were doing. Their dream was to build bigger, more complex plants. And now that's what they're doing now.

114.    Gianarikas then asked Mann about the commercial viability of AVLIS technology, and how ASPI had to overcome these challenges. Mann responded by merely referring to work on the laser component of the AVLIS system, but failed to cite any work that ASPI had done processing uranium (because no work was done):

Gianarikas: You can read this stuff online where people at least have tried AVLIS enrichment technology, laser based, quantum enrichment sort of enrichment technology. It hasn't worked right, it just hasn't really worked successfully. And I think what investors, what we are really looking to understand is well, how can you do it? If there's been country level efforts, billions I'm assuming of dollars spent on this stuff, suddenly this company from South Africa says "we can do it." You know like well, how do we feel comfortable with that? We'll get to a lot more questions in a second, but can

you just talk about why you feel comfortable that it works? And you did it with Ytterbium, right? You're doing it right now at least in the facility that you've built, but how do we know that the technology is transferable to uranium? And how do we know that after all these other independent parties have tried to do it, suddenly you've figured it out?

Mann: So let's remember that everyone else was trying to do it back in the 90s, early part of 2000s, so 30 years ago. That was one of the longest bear markets we've ever seen in uranium and in isotopes. So I think most of those programs may well have shut down for commercial reasons because it's very challenging to compete against a country, who are basically selling downgraded weapons grade material at basically zero cost. That's a very challenging market to compete against. Also, I would not want to use AVLIS or lasers to produce LEU and compete against a Russian centrifuge.14 That's tough. That's a very tough business to do. And then secondly, what I said earlier about technology moving on. I mean technology doesn't stay stationary, it accelerates and moves, and technologies evolve over time. As I said earlier, the lasers are very different now to what they were, you know, 30 years ago. Everything's very different to almost 30 years ago . . . And also no one's tried to improve it for the last 20 years. These programs shut down over 20 years ago. And . . . in general in isotope enrichment, very few people invested in this industry over the last 20 years, there has been very little innovation.

115.    Gianarikas further questioned Mann about the feasibility of laser enrichment, and

technical problems with ASPI's stated approach. Mann provided the following vague response and

failed to refer to any work ASPI conducted on uranium.

Gianarikas: There have been some papers written that have skepticism around your approach to laser enrichment. You know, maybe it gets a little too hot. Maybe using uranium metal isn't the right feedstock. Can you just make us feel comfortable that it doesn't get too hot or the uranium metal is the right the right feedstock? And also, you're using the process for Ytterbium, right. Can you help us understand or give us comfort that jumping from that to uranium is, I don't call it easy, but not that much of a leap?

Mann: . . . We're [unintelligible] process uranium at about 3000 Kelvin, that's where it vaporizes. And again we can change that temperature a little bit, change some of the attributes inside where we process it. And, you know, none of the chemicals we process are particularly friendly chemicals. Would I rather process uranium at 3000 Kelvin or UF6 gas at 70 degrees C? I'm not sure. Neither are particularly pleasant . . . we're very used to dealing with challenging chemistries. None of the chemicals we process are particularly friendly. So uranium is just one other challenging chemical. You just have the right abatement systems in place and the right safety processes in place.

116.    Gianarikas then pressed Mann for a more direct answer, asking: "But so can you talk about those technical questions. Is 3000 Kelvin too hot? Is there something that breaks down at that level, heat level? And also is uranium metal too difficult to work with as a feedstock?" Mann responded with the following vague assertions unsupported by any real-world experience processing uranium:

> So is 3000 Kelvin hot? Yes, it is hot. Is it too hot? There are materials that handle 3000 Kelvin. You have to heat it up slightly differently as well. You can't use thermal heating to heat up to 3000 Kelvin [unintelligible] efficient. So there's different ways to heat it up. And then in terms of is the material challenging process? Most of the chemicals we process are challenging. It's probably, uranium is a metal, its probably less challenging than a lot of the chemicals we currently handle. So our team are very confident they can process uranium metal.

117.    Mann's interview further revealed that ASPI never worked with uranium, and had never even began to solve the challenging technical and scientific problems that led prior efforts at AVLIS based enrichment processes to be discontinued.

118.    On this news, ASPI's share price fell $0.83 as compared to the prior day closing price, or 14.2% to close at $5.02 per share on November 27, 2024, on heavy trading volume.

**The Individual Defendants Concealed that ASPI Had Not Tested Its Technologies on Uranium and Lacked a Reasonable Basis for Uranium-Specific Claims**

119.    Throughout the Relevant Period, the Individual Defendants knew, but failed to disclose to investors, that neither ASPI nor its predecessor Klydon had ever experimented with or tested their technology on uranium.

120.    These concealed facts caused ASPI to issue misleading public statements during the Relevant Period, such as touting experience using lasers to enrich uranium, and publishing data comparing quantum enrichment to other enrichment methods. The Individual Defendants'

misrepresentations and omissions caused ASPI to materially mislead the investing public, and even

a professional stock analyst in the sustainable energy industry who covered ASPI.

121.    On December 4, 2024, plaintiffs in the Securities Class Action, filed a complaint

against ASPI, Defendant Mann, and the Chief Financial Officer Heather Kiessling. Thereafter, on

May 28, 2025, plaintiffs filed an Amended Class Action Complaint for Violations of the Federal

Securities Laws ("Amended Complaint"). *See* Securities Class Action, ECF No. 28. ¶47.

122.    The Amended Complaint alleges, among other things, that ASPI misled the

investing public and never had a basis to make its grand claims about uranium enrichment. The

Amended Complaint supports those allegations by disclosing statements from former ASPI and

Klydon employees who confirmed that ASPI's "vaunted" laser technology never advanced beyond

the theoretical level. *Id*. at ¶¶47-49.

123.    The Amended Complaint includes the accounts from a former ASPI employee who

worked as head of empirical research at Klydon from July 2007 and eventually began working for

ASPI following its acquisition of Klydon. *Id*. at ¶49. At ASPI, this employee worked as an assistant

to the manager of Research and Development, Xandra van Heerden, until her employment was

terminated in January 2024. *Id*.  According to the Amended Complaint, this former ASPI employee

worked directly with Defendant Mann and ASPI's Chief Operating Officer, Robert Ainscow,

among others, and attended weekly management meetings with Mann relating to ASPI's planned

molybdenum plant. *See* Amended Complaint, ¶49. According to this former employee, at the time

she left the Company, "[t]hey were only planning [the laser technology]. They were working on

the theory behind the experiments, and on the design for the test facility." *Id*.

124.    In sum, as demonstrated by the allegations of former employees in the Securities

Class Action, and then later publicly admitted by Defendant Mann during his interview with

Gianarikas, neither ASPI nor its predecessor Klydon had ever worked with or tested their technology on uranium, even on a laboratory scale. Nevertheless, the Individual Defendants caused ASPI to falsely convey to the market that it possessed the ability to commercially deploy its enrichment technologies to successfully enrich uranium during the Relevant Period.

## **DAMAGES TO ASPI**

125.    As a direct and proximate result of the Individual Defendants' misconduct, ASPI has suffered and continues to suffer ongoing harm.

126.    The Individual Defendants caused the Company to devote Company capital and resources to uranium enrichment initiatives without ever having tested its technology on uranium itself. The Individual Defendants caused the Company to waste and misallocate corporate assets pursuing research, development, planning and strategic activities relating to uranium enrichment that did not and could not reasonably advance ASPI's interests. This diversion of resources toward commercially nonviable goals impaired ASPI's ability to develop legitimate opportunities and imposed ongoing costs without corresponding benefit.

127.    The Individual Defendants' misconduct also exposed ASPI to substantial legal exposure that has caused the Company to expend significant resources. Such expenditures include, but are not limited to, legal fees, costs, and amounts paid to outside lawyers, accountants, experts, and investigators in the Securities Class Action.

128.    Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

129.    The Individual Defendants unjustly enriched themselves through the receipt of compensation, equity awards, and other benefits while causing the Company to pursue commercially non-viable uranium enrichment initiatives without empirical validation and, in doing so, exposed the company to the substantial harms described herein.

130.    As a direct and proximate result of the Individual Defendants' conduct, ASPI has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

131.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

132.    ASPI is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

133.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

134.    Plaintiff is an owner of ASPI common stock and has been a continuous holder of the Company's common stock at all relevant times.

135.    A pre-suit demand on the Board is futile and therefore, excused. At the time this suit was filed, the Seven-Member Board consisted of Defendants Mann, Ryan, Gorley, Wider, and Moore together with non-party directors Maseko and Hunter.

136.    Plaintiff is required to show that a majority of these directors cannot exercise independent objective judgment about whether to bring this action or whether to prosecute this action vigorously. As set forth below, none of the Board's current directors are capable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

137.    Each of the Director Defendants faces a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

138.    The Director Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Director Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Director Defendants could not fairly and fully prosecute such a suit even if they instituted it.

139.    The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct.

140.    Defendant Mann has served as a Company director and as the Company's CEO since he co-founded ASPI in September 2021. Defendant Mann receives significant compensation from the Company as detailed above and, as the Company admits in the 2025 Proxy, is not an independent director under Rule 10A-3 of the Exchange Act and related SEC and Nasdaq listing standards. Moreover, Defendant Mann cannot be deemed independent or disinterested because he solicited the 2024 Proxy Statement which contained false and misleading statements as well as made false statements including in conference calls, presentations, and SEC filings. As a Company Director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Mann breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141.    Defendant Ryan has served as a Company director since July 2019. As such, Defendant Ryan receives compensation from the Company as detailed above. Moreover, Defendant Ryan cannot be deemed independent or disinterested because he solicited the 2024 Proxy Statement which contained false and misleading statements as detailed herein. As a Company Director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Ryan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142.    Defendant Gorley has served as a Company director since October 2023. As such, Defendant Gorley receives compensation from the Company as detailed above. Moreover, Defendant Gorley cannot be deemed independent or disinterested because he solicited the 2024 Proxy Statement which contained false and misleading statements as detailed herein. Further, the 2024 Proxy solicited his re-election to the Board. As a Company Director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Gorley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143.    Defendant Wider has served as a Company director since October 2021. As such, Defendant Wider receives compensation from the Company as detailed above. Moreover, Defendant Wider cannot be deemed independent or disinterested because he solicited the 2024 Proxy Statement which contained false and misleading statements as detailed herein. As a Company Director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Wider breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

144.    Defendant Moore has served as a Company director since October 2021. As such, Defendant Moore receives compensation from the Company as detailed above. Moreover, Defendant Moore cannot be deemed independent or disinterested because he solicited the 2024

Proxy Statement which contained false and misleading statements as detailed herein. Further, the 2024 Proxy solicited his re-election to the Board. As a Company Director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor controls over reporting, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Moore breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.    Non-Party Maseko is not disinterested or independent. Director Maseko has served as a member of the Board from April 2025, to present and, as detailed above, receives compensation for his service as a director. As such, Director Maseko cannot be considered independent or disinterested with respect to members of the Board and committees.

146.    Non-Party Hunter is not disinterested or independent. Director Hunter has served as a member of the Board from September 2025, to present and, as detailed above, receives compensation for his service as a director. As such, Director Hunter cannot be considered independent or disinterested with respect to members of the Board and committees.

147.    Defendants Ryan, Moore, and Wider either serve, or served during the Relevant Period, as members of the Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent or correct the issuance of material misstatements and omissions regarding the Company's financial outlook. Therefore, Defendants Ryan, Moore, and Wider cannot independently consider any demand to sue themselves for

breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

148.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct, which goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to ASPI's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

149.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

150.    The Director Defendants may be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of ASPI. If there is a liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action

brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of ASPI, there would be no insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

151.    If there is no liability insurance, then the Director Defendants will not cause ASPI to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

152.    Accordingly, for all of the reasons set forth above, all of the current directors cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT ONE

### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

153.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

154.    The Individual Defendants solicited the 2024 Proxy Statement containing materially false and misleading statements and/or omissions.

155.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

156.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

157.    The 2024 Proxy Statement failed to disclose that: (1) neither ASPI nor its predecessor Klydon had ever experimented with or tested their technology on uranium; (2) ASPI's quantum enrichment technology, as applied to uranium, was entirely theoretical and lacked any real-world research and development; (3) ASPI had no reasonable basis to believe that it could construct a commercially viable HALEU facility given that it never even attempted to use its technology on uranium; and (4) ASPI severely overstated the significance of the MOU it signed with TerraPower.

158.    In exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination.

159.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

160.    Plaintiff on behalf of ASPI has no adequate remedy at law.

## COUNT TWO

### Against the Individual Defendants for Breach of Fiduciary Duties

161.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

162.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ASPI's business and affairs.

163.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

164.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of ASPI.

165.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

166.    In further breach of their fiduciary duties owed to ASPI, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that:

167.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

168.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

169.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

170.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

171.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, ASPI has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

172.    Plaintiff on behalf of ASPI has no adequate remedy at law.

## COUNT THREE

### Against Defendant Mann for Contribution

173.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

174.    The conduct of Defendant Mann as described herein has exposed the Company to significant liability under various federal securities laws by their misconduct.

175.    ASPI and Mann are both named as defendants in the Securities Class Action that alleges and asserts claims arising under the federal securities laws. ASPI is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.

176.    If ASPI is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of Defendant Mann as alleged herein, who has caused the Company to suffer substantial harm through their misconduct. ASPI is entitled to contribution and indemnification from Defendant Mann in connection with all claims that have been, are, or may be asserted against the Company by virtue of his wrongdoing.

177.    As and officer and/or director, Defendant Mann had the power or ability to, and did, control or influence, either directly or indirectly, ASPI's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated the federal securities laws.

178.    Defendant Mann is liable under §21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the federal securities laws.

179.    Defendant Mann has damaged the Company and is liable to the Company for contribution.

180.    As such, ASPI is entitled to receive all appropriate contribution or indemnification from Defendant Mann.

## COUNT FOUR

### Against the Individual Defendants for Unjust Enrichment

181.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

182.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, ASPI.

183.    The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from ASPI that was tied to the performance or artificially-inflated valuation of ASPI or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

184.    Plaintiff, as a shareholder and a representative of ASPI, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

185.    Plaintiff on behalf of ASPI has no adequate remedy at law.

## COUNT FIVE

### Against the Individual Defendants for Waste of Corporate Assets

186.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

187.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

188.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (1) pursuing uranium enrichment initiatives which the Individual Defendants knew or should have known was commercially non-viable; (2) paying excessive compensation, bonuses, and termination payments to certain of its executive officers, as detailed, *supra*; (3) awarding self-interested stock options to certain officers and directors; and (4) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Action, addressing the Individual Defendants' unlawful action.

189.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

190.    Plaintiff, on behalf of ASPI, has no adequate remedy at law.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Awarding, against all the Individual Defendants, jointly and severally, and in favor of the Company, all losses and damages sustained by the Company as a result of the acts and

transactions complained of herein, together with pre-judgment interest, in a fashion that ensures the Individual Defendants do not participate therein or benefit thereby;

C.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options, and common stock sale proceeds, and imposing a constructive trust thereon;

D.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.    Awarding punitive damages;

F.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: January 30, 2026                    Respectfully submitted,

**CONDON TOBIN SLADEK SPARKS NERENBERG PLLC**

_/s/ Stuart L. Cochran_
Stuart L. Cochran
State Bar No. 24027936
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone: (214) 265-3804
Facsimile: (214) 691-6311
Email: scochran@condontobin.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com

**COUNSEL FOR PLAINTIFF**

Docusign Envelope ID: B6329969-09F7-488A-A025-314086969ADD

## <u>VERIFICATION</u>

I, Robert Jenis am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. 1/15/2026



Robert Jenis